UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IOWA NETWORK SERVICES, INC.<br><br>Plaintiffs,<br><br>v.<br><br>AT&T CORP.,<br><br>Defendant. | Civil Action No.:   14-cv-03439 (PGS)<br><br>MEMORANDUM<br>ORDER |

This matter is before the Court on two motions brought by Plaintiff, Iowa Network Services ("INS"): 1) Motion to Dismiss Counterclaims under Rule 12(b)(6) (ECF No. 12) and 2) Motion for Summary Judgment on Plaintiff's Tariff Claims (ECF No. 26). There is also a threshold issue presented, which is whether the doctrine of primary jurisdiction warrants referral of one or more of the issues in this matter to the Federal Communications Commission ("FCC"). The primary jurisdiction issue was raised in a July 6, 2015 letter to the Court by defendant AT&T, and the Court considers same as a motion to stay and refer the matter to the FCC.

I.

Defendant AT&T is a provider of long distance telecommunications services to all states. Plaintiff Iowa Network Services ("INS") provides telecommunication services known as Central Equal Access ("CEA") services within Iowa. AT&T transports telecommunication traffic to and from local telephone companies that serve end user customers. To transport communication traffic to end users in rural Iowa, AT&T delivers traffic to INS, then INS sends or switches the traffic to its network or the network of other local telephone companies who then, in turn, deliver the call to the end user. For INS

1

services, INS charges AT&T a fee set forth in a tariff filed with the FCC (discussed below).

AT&T has denied that any fees are owed to INS, and has filed counterclaims alleging that INS's operational practices in imposing tariffed rates for CEA service violate several provisions of the Federal Communications Act ("Communications Act"), including those provisions proscribing unjust and unreasonable practices. Generally speaking, AT&T alleges that INS operates contrary to the FCC's authorization by allegedly violating the Communications Act in the following ways:  (1) INS has refused to comply with certain FCC rate caps; (2) INS has channeled most of its traffic through rural local exchanges. The critical facts underlying the two contentions are that these rural exchanges are authorized to charge higher tariff rates, and as a result, the cost of the services to AT&T substantially rises, even though INS could have more effectively routed the call through local exchanges whose rates were lower.  This practice is referred to as "access stimulation."[1]  AT&T alleges that, in order to stop access stimulation, the FCC capped such rates for those charges in 2011 (*See* Connect America Fund Order).

To determine whether primary jurisdiction of the FCC should be involved, the Court undertook a more in depth review of the counterclaim.  The alleged facts below are derived primarily from the Counterclaims unless otherwise specified and are presumed to be true for the purposes of the motion to dismiss:

    1.    Access Services

According to the counterclaim, INS provides a service known as "exchange access" or more specifically, "switched access."   ECF No. 9 (Counterclaims) ¶¶ 19-29. "Switched access" is offered by

---

[1] As discussed *infra*, "access stimulation" involves routing large volumes of calls to rural areas to take advantage of the higher rural rates for access services.

2

local exchange carriers ("LECs") to long distance carriers (also known as interexchange carriers or "IXCs") to complete long distance calls. *Id.* ¶ 20. An LEC can be classified generally as an "incumbent" LEC (referred to herein as "ILEC"), which is the traditional provider of telephone services in a local exchange, or a "competitive" LEC ("CLEC"), which is a new entrant to the local telephone market. *Id.* ¶ 20. The LECs provide switch access services to IXCs pursuant either to tariffs or express contracts. *Id.*

The counterclaims provide the following example of how a long distance call is completed through these carriers: On a traditional long distance call, a caller places a call from, for example, Des Moines, IA to a friend in, for example, Chicago IL. The caller's local Iowa phone company accepts the outgoing call at a local switch that connects the caller's premises to its network, carries the call over the local network, and eventually hands off the call in or near Des Moines to the caller's selected long distance company. The long distance company (*i.e.*, the IXC) carries the call over its national network to a location near Chicago, and hands it off to a local phone company (an LEC) near Chicago that serves the called party. That Chicago LEC routes the call over its local network, including to a local "end office" switch that is directly connected to the called party's premises in Chicago, and the long distance call is completed. Counterclaims ¶ 21. In this example, the LEC that originated the call in Des Moines will assess an "originating" switch access charge on the IXC, and similar charges will be billed to the IXC for the "terminating" end of the call by the LEC in Chicago.

In the most basic scenario, the IXC establishes a "direct connection" with an LEC. This type of arrangement is used in areas where the IXC and the LEC exchange a large volume of traffic. However, with smaller LECs, there may be insufficient traffic to justify a direct connection with a particular IXC's network, and the carriers may exchange traffic indirectly through another provider. *Id.* at ¶ 27. This "indirect" calling arrangement is approved by the FCC for use in Iowa and a few other states where

3

competition for long distance services is developing. In order to successfully complete long distance traffic through indirect exchanges, a "centralized equal access" ("CEA") provider is utilized, and approved by the FCC. Because each remote ILEC had insufficient traffic volume to connect directly with each competing IXC, the remote ILECs cooperatively formed a CEA provider to transmit by long distance service to LEC. *Id.* ¶ 28. The CEA provider should provide the services at a less costly rate due to economies of scale by handling larger volumes of access traffic. *Id.* Such CEA rates are provided by a tariff approved by the FCC.

2.  INS

INS was formed in 1987 by approximately 130 rural LECs to provide transport and other access services on behalf of the rural LECs. *Id.* ¶ 29. INS was approved to provide CEA services and has deployed tandem switching and transport facilities in order to offer equal access to multiple competitive IXCs at a single centralized location. *Id.* ¶¶ 29, 32. At that time (*i.e.*, prior to the Telecommunications Act of 1996, which opened up local telephone service competition), there was only a single provider of local telephone service in a given area; there were no CLECs at that time. *Id.* ¶ 30. Also at that time, prices for services offered by LEC were determined by "rate of return" regulation, which examined a carrier's reasonable costs and demand, and then rates were set to achieve a reasonable rate of return. *Id.* ¶ 31.

INS offers a particular package of access services; specifically, INS offers access to a centralized telephone facility (called a "switch") in Des Moines, Iowa, and a network to transport calls across Iowa. *Id.* ¶¶ 34-35. INS hands off the long distance calls to or from rural LECs, who use their own facilities to terminate or originate the calls placed to end user customers, and these carriers impose their own access charges on AT&T. See *id.* ¶ 21-22. Specifically, call routing works as follows:

4

> [W]hen a customer of an IXC places a long distance call to a customer of one of the LECs that uses INS, the IXC carries the call over its network to INS's switch in Des Moines, and hand off the call to INS. INS then transports the call to a point on its fiber network that is close to the local facilities of the rural LEC. The rural LEC then picks up the call and transports it to the called party within its authorized local exchange.

Id. ¶ 34. INS generally charges the IXCs a flat, per minute rate for each call. Id. ¶ 35.

    3.    Access Stimulation

The counterclaims describe an alleged "scheme" referred to "access stimulation." Id. ¶ 10. Under this "scheme," a remote LEC, which charges higher rates for access services under the FCC's rules, partners with a company that has less expensive rates due to its generation of a great deal of traffic through free calling services. Id. As a result of this "traffic-pumping," there is a sharp increase in the call traffic coming over the IXCs to the remote LECs and a sharp increase in the fees incurred by the IXC. Id. ¶ 11. According to the Counterclaims, such traffic in Iowa would typically be routed over INS's transport ring. Id. ¶ 10.

AT&T claims that as a result of access stimulation practices, the mix of traffic that INS carries has changed significantly. Formerly, nearly all of the traffic transported by INS involved the aggregation of small volumes for each of the ILECs connected to INS. Presently, it is alleged that about 89% of the traffic handled by INS consists of traffic from CLECs engaged in access stimulation. Id. ¶ 39.

    4.    FCC Price Caps

The access services provided by LECs are regulated by the FCC. In 2011, the FCC created several new rules with respect to pricing, and capped all interstate access rates that were in effect at the time. See *In re Connect America Fund*, 26 FCC Rcd. 17663, ¶ 18 ("Connect America Order"), petitions for review denied sub nom. *In re FCC, 11-161.* 753 F.3d 1015 (10th Cir. 2014). LECs were also required

over time to reduce access rates for intrastate calls to the same level as interstate calls. The parties' briefing as well as this memo refers to these rules at "rate caps."

5. AT&T's Dispute With INS

According to AT&T, after INS filed its tariffs with rates that AT&T claims exceeded the rate caps set by FCC rules, AT&T disputed INS's charges pursuant to the billing dispute provisions in INS's tariff. *Id.* ¶ 54. AT&T also began withholding payment on certain charges, but continues to pay INS some of the amounts it has billed based upon AT&T's own estimate of what the lawful charges should be. *Id.* Nevertheless, AT&T claims it has paid millions of dollars in charges associated with access stimulation of which it contends should be refunded. *Id.* ¶ 55.

In this lawsuit, AT&T alleges that INS and the Iowa LECs that engage in access stimulation, have engaged in unreasonable, anticompetitive and unlawful practices by (1) conspiring to refuse to allow AT&T to use more efficient means to transport access stimulation traffic such as a direct connection with the LEC, and (2) insisting that AT&T route traffic through INS. AT&T seeks damages as well as declaratory and injunctive relief. Count I of the Counterclaims alleges a violation of 47 U.S.C. § 201(b), which states that "[a]ll ... practices ... in connection with communications service[] shall be just and reasonable[] and any ... practice ... that is unjust or unreasonable is declared to be unlawful. AT&T alleges that INS raised its interstate switched access rates above the cap established by the FCC and failed to reduce its intrastate switched access services as allegedly required by FCC rules. Count II alleges that INS violated 47 U.S.C. § 203, because, according to AT&T, IN S's tariffs were not lawfully filed and do not comply with FCC regulations. Thus, Counts I and II allege that, because the FCC's regulations setting the rate caps lawfully implement the requirements in Sections 201(b) and 203 of the Act that a carrier's rates for services that appear in tariffs are just and reasonable, INS's filing of a tariff

6

with above-cap rates allegedly constitutes a violation of Sections 201(b) and 203. Count III is an alternative claim alleging that if INS is determined not to be an LEC, and, as a result, not subject to the FCC's rate caps, then it is an unreasonable practice in violation of Section 201(b) for INS to seek to collect tariffed access charges, because only LECs can provide and tariff switched access services. Count IV allege that INS acted unlawfully by entering into a CEA participation agreement with an LEC, Great Lakes Communication Corporation ("Great Lakes") and providing indirect interconnection with AT&T. Count V is a declaratory judgment claim asking that the Court declare that INS is subject to the FCC's rate caps, its existing tariff violates the caps, and AT&T is not required to pay bills that contain the unlawful tariff rates. Count VI is a declaratory judgment claim in which AT&T seeks an order declaring that INS is not the exclusive provider of transport services to CLECs.

INS has moved to dismiss the Counterclaims. After that motion was fully briefed and pending, INS moved for summary judgment on the claims in the complaint.

In order to analyze the primary jurisdiction issue, the Court must decide whether the counterclaims set forth a claim upon which relief may be granted. However, the Court will first briefly address Plaintiff's motion to summary judgment.

## II.

Plaintiff has moved for summary judgment on all of the claims its complaint. AT&T has opposed the motion on both substantive as well as procedural grounds, including the fact that virtually no discovery has taken place in this matter to date. As the Third Circuit recently held, "[i]f discovery is incomplete, a district court is rarely justified in granting summary judgment, unless the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law." *Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015). In the instant matter, the parties have served

7

discovery requests but discovery was stayed before responses were served because Plaintiff filed the motion to dismiss. AT&T alleges that it seeks discovery essential to refuting INS's claims relating to agreements between INS and any access-stimulating LEC, revisions to INS's rates, INS's submissions to FCC, the services described in the complaint, billing records, and documents referring to INS as a rate-of-return carrier. Without this discovery, AT&T is prejudiced in responding to INS's summary judgment motion. As such, Plaintiff's motion for summary judgment is denied without prejudice.

The Court now turns to Plaintiff's motion to dismiss AT&T's counterclaim.

### III.

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint if the plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard does not require detailed factual allegations," but it does require 'more than labels and conclusions"; a "formulaic recitation of the elements of a cause of action" will not suffice. *Bell Atl.. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Therefore, in order to withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The plausibility standard is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard is not a "probability requirement," but "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* To decide if a complaint meets this plausibility standard and, therefore, survives a motion to dismiss, the Third Circuit has set forth a three-step analysis. A court must

8

(1) "outline the elements a plaintiff must plead to a state a claim for relief"; (2) "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth"; and (3) "look for well-pled factual allegations, assume their veracity, and then determine whether they plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) (internal quotation marks omitted); see also *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir.2010).

### A. Counts I, II, III, and V

Plaintiff moves to dismiss Counts I, II, III and V contending that these claims are barred by the Communications Act and conflict with lawful tariff rates currently in effect. First, Plaintiff argues that these counts fail to state a claim because the INS's tariffs are "deemed lawful." Under Section 204(a)(3) of the Telecommunications Act, "[a]ny charge, classification, regulation, or practice shall be effective 7 days (in the case of a reduction in rates or 15 days (in the case of an increase in rates) after the date on which it is filed with the Commission unless the Commission takes action under paragraph (1) before the end of that 7-day or 15-day period, as is appropriate." 47 U.S.C. §204(a)(3). As such, Plaintiff contends that because it filed its abovecap rates pursuant to Section 204(a)(3) and the rates were not challenged by AT&T or suspended by the FCC, the rates are lawful and cannot be challenged here.

In response, AT&T confirms that carriers commonly file tariffs with rates that the FCC has not reviewed, and if such a tariff is filed pursuant to Section 204(a)(3) and not suspended, the carrier cannot be liable retroactively for refunds even if it is later found that the carrier's rate is unreasonable. ECF No. 17 (Opp. Br.) at 7. However, AT&T argues that nothing in Section 204(a)(3) permits a carrier to file a rate or term in a tariff that the FCC has already found to be unlawful and have that rate or term, if not suspended by the FCC, transformed into a lawful rate or term. AT&T argues that INS was not permitted to file a tariff with rates above the rate cap and, therefore, the tariffs could not become effective or

9

"deemed lawful." AT&T also argues that when INS failed to revise its tariffs to reduce its intrastate rates over time (as required by the Connect America Order ¶ 801), those tariffs became unlawful and void as well. AT&T relies in large part on the position the FCC filed an amicus brief with the Third Circuit in *PaeTec Commc'ns v. MCI Commc'ns Servs.*, No 11-2268 (3d Cir. Mar. 14, 2012). In that case, a CLEC filed a switched access tariff pursuant to Section 204(a)(3) that contained rates higher than an FCC-specified benchmark. The carrier claimed that the rate was "deemed lawful" because the FCC had not suspended the tariff. The Third Circuit requested that the FCC file an amicus brief to address "[w]hether a CLEC's switched access tariff, filed on a 'streamlined' basis pursuant to 47 U.S.C. § 203(a)(3), but subsequently found to violate the FCC's benchmark, can enjoy 'deemed lawful' status?" Brief For Amicus Curiae at 2 (Brown Cert. Ex. A). The FCC answered in the negative, explaining that where a carrier is prohibited from filing a tariff, any attempt to do so would violate FCC rules and be void *ab initio* if filed with the FCC.[2] *Id.*

Additionally, AT&T takes issue with Plaintiff's argument that its claims must be dismissed because AT&T did not petition the FCC to suspend INS's tariff filings and the FCC did not suspend them. AT&T states that the FCC has previously held that decisions whether to suspend a tariff do not establish any binding precedent when the tariff is later challenged under Sections 206-208, under which AT&T's rights to relief in the proceeding arise. EFC No. 17 at 14. (citing *Qwest Communications Co. v.*

---

2      The Supreme Court has stated that it defers to the FCC in certain circumstances:
> In the absence of any unambiguous statute or regulation, we turn to the FCC's interpretation of its regulations in its amicus brief. See, e.g., *Chase Bank USA, N.A. v. McCoy*, 562 U.S. ---, ---, 131 S.Ct. 871, 880, 178 L.Ed.2d 716 (2011). As we reaffirmed earlier this Terrii, we defer to an agency's interpretation of its regulations, even in a legal brief, unless the interpretation is" 'plainly erroneous or inconsistent with the regulation [s]' " or there is any other" 'reason to suspect that he interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" *Id.,* at ---, ---, 131 S.Ct., at 880, 881 (quoting Auer v. Robbins, 519 U.S. 452, 461, 462, 117 S.Ct. 905, 137 L.Ed.2d 79(1997)).

*Northern Valley Communications*, 26 FCC Rcd. 8332, ¶ 14, petition for review denied, 717 F.3d 1017 (D.C. Cir. 2013)).

AT&T further argues that even if INS were correct and Section 204(a)(3) applied here, customers can nevertheless obtain remedies against a "deemed lawful" tariff prospectively. Consequently, AT&T contends that Count V, which seeks declaratory relief, would nevertheless survive.

Also with respect to the Counterclaim's Counts I, II, and V, AT&T contends that dismissal is not warranted because AT&T has stated a *prima facie* claim that INS is engaged in access stimulation and thus INS is also liable under Sections 201 and 203. INS calls these allegations implausible speculation, but AT&T asserts in the Counterclaims that its bills from INS show billed minutes for terminate interstate switched access were more than 30 times the volume of originating interstate switched access services, which exceeds the 3:1 ratio which triggers a presumption of access stimulation for the FCC. Counterclaims ¶ 87.

INS's second argument in support of its motion as to Counts I, II, III and V is that it is not subject to the rate caps in the Connect America Order. INS contends that the Connect America Order does not apply to CEA tariff rates or the functions performed by CEA service. INS claims it is not an ILEC and thus is not a "rate of return" carrier as set forth in 47 C.F.R. § 5 1.903(g) and as such is not subject to the rate caps. AT&T argues that the FCC applied the caps to "all" interstate switched access services, including "all transport rates" and as INS's CEA service is a type of switched access service, the rate caps apply. *See* Connect America Order, ¶800-0 1.

B. <u>Counts IV and VI</u>

In Counts IV and VI, AT&T contends INS conspired with another LEC, Great Lakes, to force AT&T to use INS's services despite the fact that they were not necessary and were costly. INS argues

11

that the interconnection agreement with Great Lakes is "mandated" by the FCC, Iowa Board of Utilities, and court decisions. It further argues there is no legal basis to hold INS responsible for Great Lake's network design and call routing. INS also argues the claims are barred by the Hobb's Act.

In response, AT&T argues that the regulatory decisions that INS contends "mandates" the arrangement are all at least 20 years old and could not "mandate" any interconnection agreement between INS and CLECs like Great Lakes for the simple reason that CLECs did not exist that long ago because there was no competition in providing local access services. In local markets, competition did not arise until passage of the Telecommunications Act of 1996. AT&T also argues that even if INS were correct and there was some requirement that AT&T connect to CLECs through INS, on the facts pled here INS's arrangement is nevertheless unreasonable because on large volumes of calls INS's service (which AT&T alleges is unnecessary) substantially increase AT&T's costs without a corresponding benefit. Finally, to the extent that INS contends that it cannot be liable for Great Lake's network design and call routing, AT&T argues that the Court cannot make such a finding based solely on the pleadings.

The Court has considered the facts alleged in the Counterclaim in light of the relevant standard and that AT&T sets forth plausible causes of action in its counterclaim showing that it may be entitled to some relief. As such, the motion to dismiss is denied.

IV.

"The doctrine of primary jurisdiction . . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *U.S. Western Pac. R. Co.*, 352 U.S. 59, 63, 77 S. Ct. 161, 1 L. Ed 2d 126 (1956). It is a principle of judicial administration designed to achieve consideration between administrative agencies and the Courts." *James v. Global Tel\*Link*, 2014 U.S. Dist. Lexis 124708 \*14 (D.N.J. Sept. 8, 2014). The doctrine applies

"to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268, 113 S. Ct. 1213, 122 L. Ed.2d 604 (1993). The doctrine of primary jurisdiction should be invoked where "the matter involves technical or policy considerations which are beyond the courts ordinary competence and within the agency's field of expertise." *MCI Commc'n Corp. v. Am. Telephone & Telegraph Co.*, 496 F.2d 214, 220 (3d Cir.1974). "The Third Circuit has stated that the doctrine applies when decision-making 'is divided between courts and administrative agencies [and] calls for judicial abstention in cases where protection of the integrity of a regulatory scheme dictates primary resort to the agency which administers the scheme" *Global Naps, Inc. v. Bell Atlantic-Net Jersey, Inc.*, 287 F.Supp.2d 532, 549 (D.N.J. 2003) (quoting *Cheyney State Coil. Faculty v. Hufstedler*, 703 F.2d 732, 736 (3d Cir. 1983)). Ordinarily, primary jurisdiction "comes into play whenever enforcement of a claim requires the resolution of issues which under a regulatory scheme have been placed within the special competence of an administrative body." *James* at 2014 U.S. Dist. Lexis 124708 *4.

Generally, the Court considers four factors in determining whether to refer a matter to an administrative agency. They are:

> (1) whether the issues presented fall within the "conventional expertise" of judges; (2) whether the issues are within the agency's discretion or require the exercise of the agency's expertise; (3) whether there are any dangers of inconsistent rulings between the courts and agency; and (4) whether a prior application has been made to the agency. *Oh v. AT&T Corp.*, 76 F. Supp. 2d 551, 557 (D.N.J. 1990).

Three of these four factors support the referral of this matter to the FCC. First, the issue does not fall within the conventional expertise of the Court. I am unfamiliar with (a) "access services" practices; (b) the terms within the Connect America Order; (c) the difference between Central Equal Access (CEA)

13

services and switched access service (AT&T Answer, ¶ 2); and (d) the significance of whether INS is a rate of return carrier or a competitive local exchange carrier.

Secondly, obviously the issues concerning the relationship between a long distance carrier (AT&T) and local carrier (INS) fits within the FCC's expertise.

Third, there is some risk of inconsistent findings between this Court and the FCC. More specifically, AT&T's answer and counterclaim refer to the Great Lake Communications case against which AT&T has an action pending before the FCC. The two matters may have overlapping issues and there is a risk inconsistent findings. In light of same, the matter should be referred to the FCC.

Since this matter has been pending before the Court for about 18 months, INS objects to referring the matter to the FCC because it will further delay an expeditious result. Balancing the delay, if any, against the FCC's expertise, the latter is the more prudent approach.

INS argues that their claim does not require any special knowledge of the FCC. INS argues that the case can be resolved by simply applying the Tariff. This is not so. AT&T's answer and counterclaim alleges sophisticated practices by INS that may render some charges void under the tariff. In addition some courts have found that the reasonableness of the rates requires a reference to FCC. See *Global Naps, Inc. v. Bell Atlantic-New Jersey, Inc.*, 287 F. Supp. 2d, 532, 549 (DNJ 2004); *AT&T v. People's Network, Inc.*, 1993 U.S. Dist. Lexis 21248 * 34. *See James v. Global Tel\*Link Corp.*, 2014 U.S. Dist. Lexis 124708 * 15 (DNJ 2014). Here, the facts of the answer and counterclaim are far beyond the

"reasonableness" inquiry, and may require in depth knowledge of how the CES process operates and whether those practices may be manipulated. This requires the knowledge of fair and unbiased experts of the FCC.

### ORDER

IT IS on this 14th day of October, 2015;

ORDERED that AT&T's motion to stay the matter and refer it to the FCC is granted; and it is further;

ORDERED that Plaintiff's motion to dismiss the counterclaim (EF No. 12) is denied without prejudice; and it is further

ORDERED that Plaintiff's motion for summary judgment (ECF No. 26) is denied without prejudice.

_____
PETER G. SHERIDAN, U.S.D.J.