UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Iowa Network Services, Inc., <br><br> Plaintiff, <br><br> v. <br><br> AT&T Corp., <br><br> Defendant. | Civil Action No. <br> 3:14-cv-3439 (PGS) (LHG) <br><br> **MEMORANDUM AND ORDER** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on a motion filed by Defendant AT&T Corp. ("AT&T") to maintain a stay of this case pending further action by the Federal Communications Commission ("FCC") and the D.C. Circuit. The parties' respective briefs raise the following issues regarding the motion to maintain the stay: (1) whether a stay is permitted under the Hobbs Act, 28 U.S.C. § 2341; (2) whether the Court should continue to invoke the primary jurisdiction doctrine to continue the stay until the final outcome of the FCC proceeding; and (3) whether it would be appropriate for the Court to issue a stay pending appeal of the FCC ruling to the D.C. Circuit under *Landis v. N. Am. Co.*, 299 U.S. 248 (1936).

## FACTS

Defendant AT&T is a provider of long-distance telecommunications services to all states. Plaintiff Iowa Network Services d/b/a Aureon ("INS") provides telecommunication services known as Central Equal Access ("CEA") services within Iowa. AT&T transports telecommunication traffic to and from local telephone companies that serve end user customers.

1

To transport communication traffic to end users in rural Iowa, AT&T delivers traffic to INS, then INS sends or switches the traffic to its network or the network of other local telephone companies who then, in turn, deliver the call to the end user. For INS services, INS charges AT&T a fee set forth in a tariff filed with the FCC, as discussed below.

AT&T has denied that it owes any fees to INS, and has filed counterclaims alleging that INS's operational practices in imposing tariffed rates for CEA service violate several provisions of the Federal Communications Act ("Communications Act"), including those provisions proscribing unjust and unreasonable practices. Generally speaking, AT&T alleges that INS operated contrary to the FCC's authorization by allegedly violating the Communications Act because, *inter alia*: (1) INS has refused to comply with certain FCC rate caps; and (2) INS has channeled most of its traffic through rural local exchanges. The critical facts underlying these two contentions are that these rural exchanges are authorized to charge higher tariff rates, and as a result, the cost of the services to AT&T substantially rises, even though INS could have more effectively routed the call through local exchanges whose rates were lower. This practice is referred to as "access stimulation." AT&T alleges that, in order to stop access stimulation, the FCC capped such rates for those charges in 2011.

On October 14, 2015, the Court, among other things, referred this matter to the FCC pursuant to the primary jurisdiction doctrine. (*See* ECF No. 43). In determining whether to refer the matter to the FCC, the Court undertook an in-depth review of the facts alleged in AT&T's counterclaims. (*See id.*; ECF No. 9). For context, some of these facts are recapitulated below.

i. ACCESS SERVICES

According to AT&T's counterclaims, INS provides a service known as "exchange access" or more specifically, "switched access." (Defendant's Answer and Counterclaims ("Counterclaims") ¶¶ 19-29, ECF No. 9). "Switched access" is offered by local exchange carriers ("LECs") to long distance carriers (also known as interexchange carriers or "IXCs") to complete long distance calls. (*Id.* ¶ 20). An LEC can be classified generally as an "incumbent" LEC (referred to herein as "ILEC"), which is the traditional provider of telephone services in a local exchange, or a "competitive" LEC ("CLEC"), which is a new entrant to the local telephone market. (*Id.*). The LECs provide switch access services to IXCs pursuant either to tariffs or express contracts. (*Id.*) The counterclaims provide the following example of how a long distance call is completed through these carriers: On a traditional long distance call, a caller places a call from, for example, Des Moines, Iowa to a friend in, for example, Chicago, Illinois. The caller's local Iowa phone company accepts the outgoing call at a local switch that connects the caller's premises to its network, carries the call over the local network, and eventually hands off the call in or near Des Moines to the caller's selected long distance company. The long distance company (*i.e.*, the IXC) carries the call over its national network to a location near Chicago, and hands it off to a local phone company (an LEC) near Chicago that serves the called party. That Chicago LEC routes the call over its local network, including to a local "end office" switch that is directly connected to the called party's premises in Chicago, and the long distance call is completed. (*Id.* ¶ 21). In this example, the LEC that originated the call in Des Moines will assess an "originating" switch access charge on the IXC, and similar charges will be billed to the IXC for the "terminating" end of the call by the LEC in Chicago.

In the most basic scenario, the IXC establishes a "direct connection" with an LEC. This type of arrangement is used in areas where the IXC and the LEC exchange a large volume of traffic. However, with smaller LECs, there may be insufficient traffic to justify a direct connection with a particular IXC's network, and the carriers may exchange traffic indirectly through another provider. (*Id.* ¶ 27). This "indirect" calling arrangement is approved by the FCC for use in Iowa and a few other states where competition for long distance services is developing. In order to successfully complete long-distance traffic through indirect exchanges, a CEA provider is utilized, and approved by the FCC. Because each remote ILEC had insufficient traffic volume to connect directly with each competing IXC, the remote ILECs cooperatively formed a CEA provider to transmit by long distance service to LEC. (*Id.* ¶ 28). The CEA provider should provide the services at a less costly rate due to economies of scale by handling larger volumes of access traffic. (*Id.*). Such CEA rates are provided by a tariff approved by the FCC.

ii. <u>INS</u>

INS was formed in 1987 by approximately 130 rural LECs to provide transport and other access services on behalf of the rural LECs. (*Id.* ¶ 29). INS was approved to provide CEA services and has deployed tandem switching and transport facilities in order to offer equal access to multiple competitive IXCs at a single centralized location. (*Id.* ¶¶ 29, 32). At that time (*i.e.*, prior to the Telecommunications Act of 1996, which opened up local telephone service competition), there was only a single provider of local telephone service in a given area; there were no CLECs at that time. (*Id.* ¶ 30). Also at that time, prices for services offered by LEC were determined by "rate of return" regulation, which examined a carrier's reasonable costs and demand, and then rates were set to achieve a reasonable rate of return. (*Id.* ¶ 31).

INS offers a particular package of access services; specifically, INS offers access to a centralized telephone facility (called a "switch") in Des Moines, Iowa, and a network to transport calls across Iowa. (*Id.* ¶¶ 34-35). INS hands off the long distance calls to or from rural LECs, who use their own facilities to terminate or originate the calls placed to end user customers, and these carriers impose their own access charges on AT&T. Specifically, call routing works as follows:

> [W]hen a customer of an IXC places a long distance call to a customer of one of the LECs that uses INS, the IXC carries the call over its network to INS's switch in Des Moines, and hands off the call to INS. INS then transports the call to a point on its fiber network that is close to the local facilities of the rural LEC. The rural LEC then picks up the call and transports it to the called party within its authorized local exchange.

(*Id.* ¶ 34). INS generally charges the IXCs a flat, per minute rate for each call. (*Id.* ¶ 35).

iii. ACCESS STIMULATION

AT&T's counterclaims describe an alleged "scheme" referred to "access stimulation." (*Id.* ¶ 10). Under this "scheme," a remote LEC, which charges higher rates for access services under the FCC's rules, partners with a company that has less expensive rates due to its generation of a great deal of traffic through free calling services. (*Id*). As a result of this "traffic-pumping," there is a sharp increase in the call traffic coming over the IXCs to the remote LECs and a sharp increase in the fees incurred by the IXC. (*Id.* ¶ 11). As set forth in the counterclaims, such traffic in Iowa would typically be routed over INS's transport ring. (*Id.* ¶ 10). AT&T claims that as a result of these access stimulation practices, the mix of traffic that INS carries has changed significantly. Formerly, nearly all of the traffic transported by INS involved the aggregation of small volumes for each of the ILECs connected to ENS. Presently, it is alleged that about 89% of the traffic handled by INS consists of traffic from CLECs engaged in access stimulation. (*Id.* ¶ 39).

5

iv. <u>FCC PRICE CAPS</u>

The access services provided by LECs are regulated by the FCC. In 2011, the FCC created several new rules with respect to pricing, and capped all interstate access rates that were in effect at the time. *See In the Matter of Connect Am. Fund A Nat'l Broadband Plan for Our Future Establishing Just & Reasonable Rates for Local Exch. Carriers High-Cost Universal Serv. Support Developing an Unified Intercarrier Comp. Regime Fed.-State Joint Bd. on Universal Serv. Lifeline & Link-Up Universal Serv. Reform -- Mobility Fund* ("Connect America Order"), 26 F.C.C. Rcd. 17663, ¶ 18 (2011). LECs were also required over time to reduce access rates for intrastate calls to the same level as interstate calls. The parties' briefing, as well as this memorandum, refers to these rules at "rate caps."

v. <u>AT&T'S DISPUTE WITH INS</u>

According to AT&T, after INS filed its tariffs with rates that AT&T claims exceeded the rate caps set by FCC rules, AT&T disputed INS's charges pursuant to the billing dispute provisions in INS's tariff. (Counterclaims ¶ 54). AT&T also began withholding payment on certain charges, but continued to pay INS some of the amounts it has billed based upon AT&T's own estimate of what the lawful charges should be. (*Id.*). Nevertheless, AT&T claims that it has paid millions of dollars in charges associated with access stimulation, of which it contends should be refunded. (*Id.* ¶ 55). In sum, AT&T alleges, *inter alia*, that INS, and the Iowa LECs that engage in access stimulation, have engaged in unreasonable, anticompetitive, and unlawful practices by (1) conspiring to refuse to allow AT&T to use more efficient means to transport access stimulation traffic, such as a direct connection with the LEC; and (2) insisting that AT&T route traffic through INS. AT&T seeks damages as well as declaratory and injunctive relief. INS, on the other hand,

contends that it is owed monies for the CEA service that INS has provided and billed to AT&T, but for which AT&T has not fully compensated INS. (ECF No. 1).

## PROCEDURAL HISTORY

After AT&T objected to fees charged by INS and withheld payment, INS brought this action to recover monies allegedly owed. (*See id.*). AS discussed above, AT&T counterclaimed that INS had violated the FCC's rate caps, was engaged in access stimulation, and had conspired to deny AT&T the ability to transport traffic via a direct connection. (ECF No. 9). After considering a motion to dismiss and motion for summary judgment filed by INS and a motion to stay filed by AT&T, the court referred the matter to the "fair and unbiased experts of the FCC." (ECF No. 43). INS's motion for reconsideration and interlocutory appeal to the Third Circuit were both denied. (ECF Nos. 44, 51).

AT&T then initiated a formal complaint proceeding with the FCC, namely, by filing a complaint raising four allegations concerning: (1) unlawful billing by INS for CEA service in connection with "access stimulation" traffic; (2) FCC rate cap and rate parity rules violations; (3) FCC access stimulation rules violations; and (4) INS's unreasonable manipulation of its rates. (*See* AT&T Moving Br. at 4, ECF No. 78).

The FCC issued its initial liability order in November 2017 ("*Liability Order*"), partially finding in AT&T's favor:

(1) The FCC found INS violated rate cap and rate parity rules. The FCC held that, as a dominant carrier, INS's rates must be consistent with longstanding rate-of-return regulations and that INS was subject to traditional rules for access services, which were established in 2011.

(2) The FCC found that INS's tariffs were not lawfully filed and directed INS to file a new lawful tariff. The FCC stated that a subsequent damages phase of the proceeding would determine the appropriate rate between 2013 and 2018.

(3) The FCC recognized there were "a number of significant questions about INS's CEA practices and rates that deserve[d] further exploration," but denied AT&T's claims relating to INS's purported violation of FCC access stimulation rules.

(*See id.* at 4-5; *see also* ECF No. 53, Ex. 1).

INS filed a petition for reconsideration. The FCC denied the petition, but ruled that—in light of the 2013 tariff being voided—the 2012 tariff would be deemed to have remained in effect. The FCC, however, noted that AT&T would have the opportunity in the damages phase to demonstrate that, in connection with the 2012 tariff, INS furtively employed improper accounting practices to conceal potential rate of return violations. (*See* ECF No. 54-1).

AT&T then petitioned for reconsideration, claiming that imposing the 2012 rate was improper. The FCC denied the petition, noting that AT&T would have the opportunity to challenge the 2012 rate at the damages phase of the proceeding. Both parties appealed various aspects of the FCC's orders. The FCC held the damages phase of the proceeding in abeyance.

Separately, the FCC directed INS to file a revised tariff within sixty days of the *Liability Order*, which it did on February 22, 2018. The FCC suspended the same, finding "substantial questions of lawfulness," and later rejected the revised tariff because it exceeded the applicable benchmark and violated FCC affiliate transaction rules. INS's second revised tariff was suspended and then rejected for similar reasons as the first. The FCC opened an investigation into INS's ratemaking and accounting practices. INS was then directed to file another revised tariff filing no later than April 29, 2019.

8

AT&T has appealed the FCC's imposition of the 2012 tariff rate. INS has appealed the FCC's classification of INS as a CLEC and the determination that INS's rates were unlawful. INS has also challenged the FCC's application of the CLEC benchmark rule in the investigation. The D.C. Circuit has consolidated these various petitions.

Concurrent to those proceedings, this Court considered a request by INS to lift the stay following the FCC's *Liability Order* and August 1, 2018 Order on Reconsideration ("*First Reconsideration Order*"). (ECF No. 54). The Court denied that request and continued the stay to February 15, 2019. (ECF No. 69). Although the Court also encouraged the parties to engage in FCC-supervised mediation, those negotiations were unsuccessful. The stay imposed by this Court automatically expired on February 15, 2019. Currently pending before this Court is a motion filed by AT&T to maintain the stay of the proceedings pending the outcome of the D.C. Circuit proceeding and the damages phase of the FCC proceeding.

## LEGAL STANDARD

Three distinct legal issues are presented in this motion. *First*, whether, as INS argues, maintaining a stay would violate the Hobbs Act. *Second*, whether, as AT&T argues, the Court should maintain the stay pursuant to primary jurisdiction doctrine. *Third*, whether the Court could properly exercise its inherent power to maintain the stay in this proceeding. The Court will address these legal issues in turn.

## HOBBS ACT

INS argues that the Court lacks jurisdiction to issue the requested stay because the Hobbs Act confers exclusive jurisdiction to the federal courts of appeals with respect to stays of FCC orders. (INS Opp. Br. at 19-20, ECF No. 80). "The Hobbs Act provides the federal courts of appeal with 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to

determine the validity' of FCC orders." *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1306-07 (11th Cir. 2015). "District courts may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation . . . ." *Id.* at 1306 (citation omitted). "If the Hobbs Act applies, a district court must afford FCC final orders deference and may only consider whether the alleged action violates FCC rules or regulations." *Id.*

In particular, INS supports its position by citing *Sliwa v. Bright House Networks, LLC*, No. 216CV235FTM29MRM, 2016 WL 3901378, at *4 (M.D. Fla. July 19, 2016), which, in relevant part, held: "Staying this case because the Circuit Court *may* conclude that FCC incorrectly interpreted the TCPA is the *opposite* of affording the Final Order deference." However, the Court finds *Silwa* distinguishable from the present case. Specifically, in that case, the motion to stay was filed *after* the FCC issued a *final* order. *Silwa*, 2016 WL 3901378, at *2. Here, the FCC issued an order that pertains *only* to liability. The FCC noted that a subsequent damages phase will take place after the interlocutory appeal is decided.

Indeed, our sister courts have declined to find that the Hobbs Act precludes a district court from entering a stay. *See, e.g.*, *Sessions v. Barclays Bank Delaware*, 276 F. Supp. 3d 1349, 1351 (N.D. Ga. 2017) (citation omitted) ("Because the decision in the [D.C. Circuit] . . . 'is likely to have a substantial or controlling effect on the claims and issues' in this case, a stay is appropriate."); *Rajput v. Synchrony Bank*, 221 F. Supp. 3d 607, 616 (M.D. Pa. 2016).

In short, the Court concludes that the Hobbs Act does not displace this Court's power to stay the proceeding, which is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254 (1936); *see also Ethicon v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988) (citation omitted) (recognizing the district courts' "inherent power to manage their

dockets and stay proceedings, including the authority to order a stay pending conclusion of a [Patent and Trademark Office] reexamination").

## PRIMARY JURISDICTION

AT&T seeks an order from this Court maintaining the stay in this action until the D.C. Circuit and FCC have "completed their work." (*See* AT&T Moving Br. at 13-22). Specifically, AT&T's argument is premised on the doctrine of primary jurisdiction. Primary jurisdiction "is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). The doctrine "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *U.S. Western Pac. R. Co.*, 352 U.S. 59, 63 (1956). "[I]t is a principle of judicial administration designed to achieve consideration between administrative agencies and the Courts." *James v. Global TelLink*, No. 13-cv-4989, 2014 WL 4425818, at *5 (D.N.J. Sep. 8, 2014). The doctrine applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter*, 507 U.S. at 268. The doctrine of primary jurisdiction should be invoked where "the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's field of expertise." *MCI Commc'n Corp. v. Am. Telephone & Telegraph Co.*, 496 F.2d 214, 220 (3d Cir. 1974).

"The Third Circuit has stated that the doctrine applies when decision-making is divided between courts and administrative agencies [and] calls for judicial abstention in cases where protection of the integrity of a regulatory scheme dictates primary resort to the agency which administers the scheme." *Global Naps, Inc. v. Bell Atlantic-Net Jersey, Inc.*, 287 F.Supp.2d 532, 549 (D.N.J. 2003) (quotation marks omitted) (quoting *Cheyney State Coil. Faculty v. Hifstedler*,

703 F.2d 732, 736 (3d Cir. 1983)). Ordinarily, primary jurisdiction "comes into play whenever enforcement of a claim requires the resolution of issues which under a regulatory scheme have been placed within the special competence of an administrative body." *James*, 2014 WL 4425818, at *6.

Generally, under the primary jurisdiction doctrine, the Court considers four factors in determining whether to refer a matter to an administrative agency: (1) whether the issues presented fall within the "conventional expertise" of judges; (2) whether the issues are within the agency's discretion or require the exercise of the agency's expertise; (3) whether there are any dangers of inconsistent rulings between the courts and agency; and (4) whether a prior application has been made to the agency. *See Oh v. AT&T Corp.*, 76 F. Supp. 2d 551, 557 (D.N.J. 1990). Under the circumstances at bar, the Court finds that all four of the *Oh* factors are present.

*First*, as the Court has already held in its October 14, 2015 referral order (ECF No. 43), many issues presented in this matter do not fall within the conventional expertise of the Court, which include, *inter alia*: (1) "access services" practices; (2) the terms within the Connect America Order; (3) the difference between CEA services and switched access service; and (4) the significance of whether INS is a rate of return carrier or a competitive local exchange carrier. *Second*, the remaining issues presented, currently before the FCC, relate to damages as a result of INS's purported liability. Specifically, the FCC will need to determine, among other things, whether the 2012 rate is a lawful rate. This issue is beyond the expertise of the Court and within the agency's discretion. *Third*, the FCC's liability order is currently on appeal. If the Court now lifts the stay and issues a ruling in this action, an appellate court could reverse and/or remand the FCC order, which could result in inconsistent rulings. The FCC's damages order could also be inconsistent with an order by this Court. Therefore, there is a high risk of inconsistent rulings

between the courts and the agency. *Finally*, an application has plainly been made to the FCC, thus satisfying the fourth factor.

As demonstrated above, all primary jurisdiction factors are present in this action. Therefore, the Court finds that a stay based on primary jurisdiction is warranted, particularly in view of the fact that the claims and issues before the Court are "factually and legally intertwined" with the issues "pending resolution before the FCC," as well as the D.C. Circuit. *See Peerless Network, Inc. v. MCI Commc'ns Servs., Inc.*, 917 F.3d 538, 543-44 (7th Cir. 2019).

### THE COURT'S INHERENT POWER TO STAY PROCEEDINGS

Alternatively, the Court also finds that its inherent power to stay judicial proceedings justifies continuing the stay in this case. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254. A court considering a motion to stay proceedings (or, as is the case here, a motion to continue, or reimpose, a stay) "must weigh competing interests and maintain an even balance." *Id.* at 254-55. The party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay . . . will work damage to someone else." *Id.* at 255.

Under *Landis* and its progeny, courts generally weigh a number of factors in determining whether a stay is appropriate, including:

> whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party, (2) whether denial of the stay would create a clear case of hardship or inequity for the moving party; (3) whether a stay would simplify the issues and the trial of the case, and (4) whether discovery is complete and/or a trial date has been set.

*Akishev v. Kapustin*, 23 F. Supp. 3d 440, 446 (D.N.J. 2014) (citations and quotation marks omitted). Additional considerations also "arise depending upon the circumstances for which the

13

movant requests a stay." *Id.* "Where a stay is sought pending resolution of purportedly related litigation, ... courts consider whether resolution of the related litigation would substantially impact or otherwise render moot the present action." *Id.* The Court reviews each of the above four factors below.

i. FACTOR ONE: WHETHER A STAY WILL RESULT IN PREJUDICE

INS sets forth two primary reasons why it will purportedly suffer prejudice if the stay in this matter is continued: (1) AT&T has not paid INS "the lawful rate for nearly five years ... for service provided to AT&T" (INS Opp. Br. at 25); and (2) the matter could be ongoing for a long time because: the D.C. Circuit has not yet set this matter for oral argument; after its decision, the case could be appealed to the Supreme Court; and there is also a subsequent damages proceeding before the FCC that will take place after the appeals process has concluded. (*See id.* at 25-28).

*First*, a determination of the lawful rate is precisely what has not yet been decided by the FCC. If the D.C. Circuit reverses the FCC, the agency will be forced to reconsider the liability determination. If the D.C. Circuit affirms the agency, it must assess damages. In either outcome, it remains unclear what the lawful rate will be. Thus, INS's first contention actually supports a stay. *Second*, while it is true that this matter may continue for some time, "'mere' delay does not, without more, necessitate a finding of undue prejudice and clear tactical disadvantage.'" *Nussbaum v. Diversified Consultants, Inc.*, No. CIV. 15-600, 2015 WL 5707147, at *2 (D.N.J. Sept. 28, 2015) (quoting *Akishev*, 23 F. Supp. 3d at 447). Accordingly, the Court is not persuaded by either INS's arguments with respect to this factor.

ii. FACTOR TWO: WHETHER DENIAL OF THE STAY WOULD CREATE HARDSHIP OR INEQUITY FOR THE MOVING PARTY

INS contends that denying the stay would result in no prejudice to AT&T and, in fact, continuing the stay would permit AT&T to continue nonpayment for services rendered. (*See* INS

Opp. Br. at 27-28). However, the FCC has also recognized that "substantial questions of lawfulness" surround INS's ratemaking and accounting practices. (AT&T Moving Br. at 20). Further, the FCC's imposition of the 2012 tariff is an issue currently on appeal in the D.C. Circuit. In light of the uncertain legal footing upon which the imposition of the 2012 tariff sits, the Court does not find that the second factor weighs in favor of either party.

   iii.   FACTOR THREE: WHETHER A STAY WOULD SIMPLIFY THE ISSUES AND THE TRIAL OF THE CASE

The interests of judicial economy weigh in favor of continuing the stay. As mentioned above, several petitions for appellate review have been filed and consolidated before the D.C. Circuit. The issues currently pending before the D.C. Circuit include, *inter alia*: (1) imposition of the 2012 tariff rate; (2) classification of INS as a CLEC; (3) the FCC's application of the CLEC benchmark rule. (*See* AT&T Moving Br. at 9). Moreover, the FCC's decision could be reversed and/or remanded, creating a risk of inconsistent results in the two cases. Additionally, the action remains pending before the FCC.

Further, the Court notes that in *Nussbaum*, relied upon by INS, the court considered whether to stay pending the outcome of an ancillary case in which the defendant was an intervenor. With respect to the third factor, the court held: "Given that many of the relevant issues in the case before this Court fall outside the ambit of [the matter on appeal], the resolution of [that matter] seems unlikely to significantly simplify the issues before this Court or to substantially impact the outcome of the litigation." *Nussbaum*, 2015 WL 5707147, at *3. By contrast, here, the issues on appeal are substantially similar to those at issue in this case. The third factor therefore weighs strongly in favor of granting the motion.

### iv. FACTOR FOUR: WHETHER DISCOVERY IS COMPLETE AND/OR A TRIAL DATE HAS BEEN SET

This matter has been on the Court's docket since 2014. However, while the parties may have engaged in discovery before the FCC (*see* INS Opp. Br. at 33), it appears that no significant amount of discovery has taken place in this action pending in this Court. INS filed a motion for summary judgment on AT&T's counterclaims before its motion to dismiss was decided. The matter has been stayed since this Court's October 14, 2015 order, which also denied the motion to dismiss and the motion for summary judgment. Most of the documents that have been filed since that order relate to the Court lifting the stay. Therefore, although the case has been pending for a while, this factor weighs in favor of continuing the stay.

Based on this analysis, the Court finds that a stay is warranted based on the Court's inherent power to stay proceedings, in addition to the primary jurisdiction doctrine.

## ORDER

This matter comes before the Court on a motion filed by AT&T to maintain the stay of this action pending the outcome of an appeal to the D.C. Circuit of an FCC proceeding involving substantially similar legal issues; and to also stay pending the FCC's consideration of the matter after the conclusion of the D.C. Circuit appeal. The Court held oral argument on this matter on April 9, 2019. Accordingly, for the reasons stated herein and for good cause shown;

**IT IS** on this __1__ day of October, 2019;

**ORDERED** that AT&T's motion to stay (ECF No. 78) is granted in part; and it is further

**ORDERED** that this matter is stayed pending the outcome of the proceedings before the D.C. Circuit; and it is further

**ORDERED** that either party may move to further stay the proceedings after this matter is decided by the D.C. Circuit.

_____
PETER G. SHERIDAN, U.S.D.J.